**Mary C. HYDE**

v.

**PROTECTIVE INSURANCE CO.**

Civ. A. No. 84-2171.

United States District Court,
E.D. Pennsylvania.

Nov. 20, 1984.

Gordon Gelfond and Alfred Sarowitz, Philadelphia, Pa., for Mary C. Hyde.

Joseph G. Manta and Joel Schneider, Philadelphia, Pa., for Protective Ins. Co.

## MEMORANDUM

GILES, District Judge.

Plaintiff has brought this action claiming that she was the victim of sex and age discrimination. Jurisdiction is founded upon Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.* and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* After a Bench Trial and consideration of the parties' post-trial submissions, the court finds that plaintiff has not carried her burden of proof as to either claim and, accordingly, shall enter judgment in favor of defendant.

The following constitutes the court's findings of fact and conclusions of law.

Protective Insurance Company is engaged exclusively in the business of fleet truck insurance, offering personal injury and property damage coverage for over-the-road trucking operations. It does not employ claims adjusters. Rather, it contracts with independent claims adjusters to conduct field investigations of accident scenes. They gather relevant information and report either to the defendant's Branch or Headquarters Office their findings and recommendations. Within the company, there are claims supervisors who, with the adjuster's information, evaluate claims, negotiate with claimants or their attorneys, and correspond and cooperate with attorneys defending claims for the insurer. The claims supervisors are responsible for interpreting the terms and provisions of policies of Protective and those of other insurance companies whose insureds may be involved in an accident. In the branch offices, the claims supervisors have secretaries to whom they delegate various clerical aspects of the claims work.

Mrs. Hyde held such a clerical post in the Wayne, Pennsylvania office. At the time of her separation from the company she had over 15 years of service. She was paid on an hourly basis. Her immediate supervisor was Robert Zucosky the claims supervisor. He was the only claims supervisor until January, 1983. Mr. Zucosky reported directly to the Vice-President of Claims at the Home Office on all claims decisions. The manager of the entire office, which included marketing and underwriting functions, was Charles Bernier. He was hired in 1981 as Branch Manager. Mr. Bernier

was not directly responsible for the day-to-day operations and decision-making on the claims work, nor was he familiar with the standards used by the company in settling claims.

Mrs. Hyde contends that her troubles started with Mr. Bernier's arrival. She submits that he gradually and purposefully increased her workload beyond her physical ability and endurance so as to cause her to resign. She could not complete all assignments within any work day, even with overtime hours and weekend work. She contends that Mr. Bernier came to the Wayne office, with instructions from Protective's president, Gary Miller, to get rid of her because younger women could be hired for less money to perform the clerical work. She does not attribute an illegal motive to her immediate supervisor, Mr. Zucosky, in his assigning of work to her. She contends that many additional duties were assigned directly by Mr. Bernier in total disregard of her continual plea that she was already overburdened and could not reasonably do everything demanded.

This workload steadily increased, according to her, from the latter part of 1982 through July 5, 1983 when she testified that she was fired by Mr. Bernier. Her workload included correspondence and other clerical duties relating to the offices' accounts receivables. Several weeks prior to her separation, it had come to Mr. Bernier's and Mr. Zucosky's attention, through checking by the Home Office, that the Wayne office's over 90-day accounts receivables were far more numerous for May and June, 1983 than for the preceding months. In April, the receivables were around $42,000. In May, they advanced to $109,000. In June they rose to $125,000 and in July, they peaked at $165,000. The effective management of the office was questioned by the Home Office because of this lapse in the collection of the accounts receivables. On June 20, 1983, when questioned about this lapse by Mr. Zucosky, Mrs. Hyde explained that she had been unable to perform the 90-day accounts receivable work for two weeks because of other job responsibilities. However, she had not told anyone that this work had gone unattended. Mr. Zucosky told her that because of her failure to do the accounts receivable work and to tell her superiors that she had not processed this work, he would not recommend that she receive an annual increase. At the same meeting he criticized the quality and quantity of her work, telling her, in effect, that she was not working effectively or efficiently. He noted that other important work had also been left undone. She threatened to resign if she did not get a raise.

Mrs. Hyde had in all previous years received an annual increase. She had, in her mind, been a faithful and hard working employee, working even beyond her fullest capacity in an effort to keep up with her workload. Her reaction to the prospect of not getting a raise was, no doubt, a mixture of anger and disbelief. After a few weeks, when she did not get an increase, she went to Mr. Bernier's office to inquire whether there might have been some oversight. He told her that she was not going to get a raise.

At this point the testimony of Mrs. Hyde and Mr. Bernier differs substantially. Mrs. Hyde testified that after being told that she was not going to get a raise, she explained to Mr. Bernier that she needed the raise badly because she could hardly manage on her current salary. Mr. Bernier responded that she should have realized all along that he was trying to force her out; that the Home Office wanted her fired because she was too old and younger women could be hired for less money to do the same work; and that he was simply following orders in forcing her to resign. Mrs. Hyde wanted to continue working but Mr. Bernier told her to go home and not to return. Before she left he asked her to sign a letter of resignation which she refused to do. He also stated that if she ever repeated that she had been fired because of her age that she would be "blackballed" in the insurance industry by the company and she would never get another job.

Mr. Bernier, on the other hand, testified that Mrs. Hyde came to his office uninvited and inquired about a raise. He told her that she was not going to get a raise because of the recent accounts receivables problem. Mrs. Hyde responded that if she did not get a raise she would quit. When Mr. Bernier would not give in, but repeated that she would not get a raise, Mrs. Hyde said she was quitting and left his office. She did not go home or return to her desk immediately. She went to the ladies' room. While she was there, he called the Personnel Department of the Home Office which advised him that, in view of her stated resignation, he should attempt to obtain from her a letter of resignation. Such a letter was prepared by Mr. Bernier's secretary. When it was presented to Mrs. Hyde, she was angry that it had been prepared, and, therefore, seen by another secretary. He recalled that she stated upon leaving the premises that she would sign it later and send it in.

Mrs. Hyde also testified that after leaving she was so distraught that she needed a doctor-prescribed sedative. She was unable to return to work the next day. She did call that day or the next, spoke to Mr. Bernier and offered to come back to work. She was told that she could not because getting rid of her was what the Home Office wanted. He demanded her keys to the office. He also told her that she would have to come into the office to get her final check, herself, and that her daughter could not pick it up for her. She called the office on one occasion before going to get her check and spoke to a visiting officer from the Home Office. She repeated all that she had been told by Mr. Bernier, that is, that she had been fired because of her age at the insistence of the Home Office. This charge went unanswered in the telephone call. She arranged to meet the officer that day at a local restaurant but he did not show up as agreed.

Mrs. McGough, plaintiff's daughter, testified that when she returned the office keys for her mother, Mr. Bernier also told her that her mother had been fired because the company could hire two "young girls" to take her place for less money. On a subsequent occasion, when she accompanied plaintiff to the Wayne office to pick up her final check, she testified that Mr. Bernier reiterated that there was nothing he could do inasmuch as the Home Office wanted Mrs. Hyde fired because she was too old.

Mr. Bernier denied that he told Mrs. McGough that her mother was fired because of her age or for the purpose of hiring a younger woman or that she had even been fired. He also denied that he threatened that she would be "blackballed."

With respect to her Title VII sex discrimination claim, plaintiff contends that in late 1982 she was being trained by her boss, Mr. Zucosky, to become a claims supervisor and to take on some of the claims adjusting work then being performed by him. She contends that her training stopped because the company wanted that kind of work to be performed by males only. She claims that she was qualified for the position by her job experience and that the minimum prerequisites of college education and 3–5 years of prior claims adjusting experience stated at trial by defendants are not job related and were advanced as a pretext for denying her the appointment. Plaintiff contends that she was never told of these minimum qualifications nor given the chance to qualify through on-the-job training. Defendant denies these allegations, contending that she was simply not qualified for the position and that its hiring criteria are job related.

This case presents determinative credibility issues. On balance, I find that the plaintiff's version of events is not as credible as defendant's. First, I find that Mr. Bernier is a disinterested witness. Subsequent to plaintiff's departure from Protective, Mr. Bernier was fired because he had a difference of opinion with Protective's president, Mr. Miller, over the small fleet policy. Thus, he had nothing to gain by protecting Protective during the trial.

It is undisputed that there was a dramatic increase in workload for all employees at the Wayne branch office directly attributable to the underwriting of small fleet coverage. Prior to this decision to underwrite small fleet coverage, Protective had worked exclusively with large fleet coverage, where one policy covered many vehicles. With small fleet coverage, many policies had to be written. The bulk of the small fleet policies were written in the New York City area. A flood of claims resulted. Consequently, beginning around the end of 1982 and continuing well beyond plaintiff's employment with Protective there was a steadily increasing claims workload. The small fleet policy marketing approach also worked a mountainous workload on the underwriting and marketing aspects of the office. Because the office staff was limited in number, the pressure of the workload was felt by all employees as well as the several managers. Plaintiff was not aware of the workloads of the other employees. I accept the testimony of Mr. Bernier that all employees were busy and that no relief could be given to plaintiff's claims workload by the underwriting employees who were also paid on an hourly basis.

Plaintiff was asked to prepare an estimate of the amount of time she had to devote to her various duties. Mr. Bernier stated that this request was made of her to obtain information necessary to persuade the Home Office, which was very cost-conscious, of the need for more staff assistance in the office. I credit this aspect of Mr. Bernier's testimony. There were two proposals, which were identified at trial, to meet the press of the generated work. One was to employ, on the underwriting side, certain innovative electronic devices, cathode ray tubes (CRTs), which would increase the work output. The other was to evaluate the clerical claims workload to justify hiring another claims secretary. These proposals resulted in the hiring of another claims secretary around mid-June who was assigned the accounts receivable work.

Despite repeated requests for a time estimation of her various tasks, plaintiff failed to provide one for her manager. I find that it could have been done with reasonably little effort. That it was not done, is attributed to a belief by plaintiff that she should not have to justify the time spent on the work since it was obvious that she was overworked. She testified that she never had time to make the approximation of time that had to be devoted daily to the several aspects of her job. Plaintiff's explanation is not credible. She ignored the obvious importance of the request to her own detriment. It seems that she began to engage in a power struggle with her local management, pitting against their power to dictate assignments her sense of power over the rate of production of the clerical work. For example, when she stopped processing the accounts receivable work, she told no one that she assigned no priority at all to a task which she had to know was a priority item for the company. If plaintiff elected not to do the accounts receivable work to get management's attention, she succeeded but used poor judgment in doing so. She was blamed by her superiors, not so much for failing to do the work, but for failing to advise them that she had not been able to perform that specific task.

Mr. Zucosky, and not Mr. Bernier, was responsible for assigning plaintiff the claims work, including accounts receivables. As plaintiff's witness, he testified that in June when he evaluated plaintiff's work as deficient, he was sincere in believing that she deserved no raise. He was not motivated by sex or age animus. Plaintiff does not attribute her firing to Mr. Zucosky. I accept his testimony in this respect.

On July 5, 1983, plaintiff by-passed Mr. Zucosky in inquiring about a raise. She went directly to Mr. Bernier, who reiterated Mr. Zukosky's recommendation of no raise and restated the reasons. Mr. Bernier's testimony as to the events in his office are the more credible. First, plaintiff's contention at trial that she was fired and did not resign is totally at odds with all of her pretrial statements made under oath. She stated before the Unemployment Compensation Board, the Equal Em-

ployment Opportunity Commission and in the complaint filed in this action that there was an act of resignation. To now deny that she resigned renders her testimony suspect. She went into Mr. Bernier's office unannounced and unsolicited. Mr. Bernier could not have been planning to fire her at that time. Plaintiff's testimony that Mr. Bernier told her he was carrying out a Home Office desire or directive in firing her makes little sense inasmuch as he had not called the Home Office before plaintiff was allegedly fired. Since she was not getting a raise there was no added economic burden in keeping her. The company was responding to her complaints that she needed help by hiring another clerical assistant. There was no one then employed, including the newly hired claims secretary, who was trained to assume plaintiff's duties in a manner that would ensure smooth claims operations, especially considering plaintiff's extensive knowledge of the company's files, procedures and claims. From the record, the last thing that Mr. Bernier needed in July, 1983, was another problem in the hectic administration of the small fleet policy program. Plaintiff's sudden departure could only have added to the administrative headache. Hence, the timing of plaintiff's leaving was not likely to have been initiated by him.

She was offered an opportunity to sign a letter of resignation. She never did. The letter was not prepared before plaintiff came into Mr. Bernier's office but rather after she left and he had called the personnel office at the Home Office for guidance. His being told to ask Mrs. Hyde to execute a letter of resignation, if she said that she was resigning, or his being instructed as manager to write down all that had transpired contemporaneous to the event, does not strike me as unusual or the basis for an inference that the Home Office was out to get rid of her. Mr. Bernier's not pleading with plaintiff not to resign after she threatened to do so if she was not given a raise does not impress me as indicative of sex or age animus. It was a reasonable, predictable response to a situation where plaintiff gave no room for compromise. I credit Mr.

Bernier's testimony that he, in fact, asked Mrs. Hyde not to resign but that he also told her that she would receive no raise.

Under the undisputed facts, I do not find that the defendant's decision not to give plaintiff a raise was a pretext for illegal employment action. Plaintiff's failure to process the accounts receivable work was knowing and her failure to inform her superiors, who took for granted that this particular work was being done assiduously, was not a mere oversight. She made a choice between this important work and other work which she believed important. Her error of judgment was in not letting the managers make that choice, if indeed a critical choice between important functions had to be made. Her omission brought considerable criticism upon Mr. Bernier, as Branch Manager, at a time when he was trying to convince the Home Office that the small fleet policy route had been the right road to take. The omission was a justifiable basis for discipline. Plaintiff refused to accept the denial of a raise as just and resigned because she felt strongly that after all the other hard work she had given the company over the years she had been grievously wronged.

Mrs. McGough testified that Mr. Bernier, whom she might have met very briefly and casually only once before, told her when she went to pick up some of her mother's personal effects from the office, and again when she went with her mother to pick up the final check that her mother had been fired for reasons of sex and age. Mr. Bernier denied any such statements. I credit his testimony.

A critical bow in plaintiff's quiver of circumstantial evidence of sex and age discrimination is a statement attributed to the president of Protective, Mr. Miller, when he placed Mr. Bernier in the Wayne Branch. Mr. Zucosky testified that Mr. Miller told Mr. Bernier that he should take steps to get rid of Mrs. Hyde. Mr. Bernier then told Mr. Zucosky about Mr. Miller's instructions. Mr. Bernier admitted that Mr. Miller had had a similar conversation with him. In 1981, the company was still committed

to a large fleet sales program and the Branch Office was unprofitable. Mr. Bernier had been hired to make changes to improve the financial picture. In the context of cost-cutting, it was thought necessary to reduce the size of the support staff. Mr. Miller stated that "one of the girls" would have to go, suggesting Mrs. Hyde since he had heard that she was a "troublemaker" from a previous Wayne branch manager. Mr. Bernier investigated the suggestion but found nothing in any file to support it. Upon arriving at the Wayne office he made his own assessment of each employee. He testified that he found no evidence that Mrs. Hyde should be eliminated from the workforce because she was a "trouble-maker." Moreover, after the small fleet policy program was underway cutting the staff size was no longer a problem or an objective because of the dramatic increase in workload. Any conclusion that Mr. Bernier was dedicated to plaintiff's dismissal from the day he arrived is undermined by the fact that he recommended plaintiff for, and she received, annual salary increases and bonuses at the end of 1981 and 1982.

During this time, Mrs. Hyde was the only employee trained to do the claims clerical work. No attempt was made to displace her from that position. She received a satisfactory performance review on December 29, 1982. Plaintiff has characterized it as a "glowing report." Her work was complimented from the mechanical, skill, and effort viewpoint. However, the evaluation noted that while "her attitude towards the job has greatly improved ... there are still areas for improvement...." Plaintiff had difficulty in getting along with several of the other women in the office. Some of the friction related to misfilings which affected plaintiff's area of responsibility. She believed that this was done purposely because it happened too frequently to be mere happenstance.

Shortly after her evaluation, there was an incident in the office involving other female staff members which prompted a meeting on January 10, 1983 between plaintiff, her immediate supervisor and Mr. Bernier. At trial, plaintiff attributed her problems to the Branch's hiring only "young girls" who for some reason resented her. As a result of the January 10 meeting a memorandum was written which plaintiff refused to sign. Plaintiff does not deny that the events related therein occurred or that there was a basis for the meeting. She now sees the writing of the memorandum as an effort to document her shortcomings with an intent to discharge her for illegal reasons. She postulates that the memorandum coincided with a visit to the Wayne office by Mr. Miller, who, she argues, must have instructed his subordinates to take steps to get rid of her. Because I find that there was cause for the meeting with plaintiff, I attribute no probative weight to the memorandum helpful to plaintiff. It is noteworthy that the memorandum does not contradict the December, 1982 evaluation. No criticism was made of her technical job performance. Rather, issue was taken with her on-the-job attitude towards other employees. Plaintiff states that Mr. Bernier once stated that her problem of relating with a particular younger employee may be due to a generation gap. Mr. Bernier admitted that he said this. In her testimony at trial, plaintiff in effect agreed that this may have been true. In any event, I give no probative weight to the comment, especially considering that it was made in a social context.

Plaintiff contends that the company became committed to hiring younger women at less pay than she was receiving at the time of separation from employment. Plaintiff's only evidence of this contention was her observation that the recently hired CRT operators were all under thirty years of age. She also stated that the second claims secretary was younger than she. Plaintiff offered no evidence that any qualified applicant protected under the ADEA had applied for any of these positions and been rejected. Mr. Bernier explained that the company looked to CRT training institutes for personnel and hired the best applicants. There is nothing improper about that approach. Plaintiff was not the only

female over 40 employed at the Branch Office. There was at least one other, who remains employed by that office. There was no evidence of the discharge of any other non-managerial employee from the Branch Office or the company. In summary, the plaintiff has failed to prove by a fair preponderance of the credible evidence that the company's reasons, advanced for denial of a raise and for her separation from employment, are pretextual for sex or age discrimination.

Plaintiff also charges that she was denied a promotion to claims supervisor based upon her sex. Mr. Zucosky testified that in late 1982 he began training her to take over some of his responsibilities in the evaluation and resolution of small claims. He further testified that when Mr. Bernier learned of this training, Mr. Bernier told him, in effect, that the company considered claims adjusting work to be restricted to men. Further, the plaintiff proved that the company has never hired a female into the position of claims supervisor. Mr. Bernier denied that he made any such statement to Mr. Zucosky. He did testify that he understood company policy to be to train claims secretaries to handle some of the small, routine property damage claims which would otherwise occupy the time of the claims supervisor. He denied having any specific knowledge that Mr. Zucosky was training Mrs. Hyde and he denied that he would have discouraged such training.

Again, a credibility determination must be made. Here, I find that the testimony of Mr. Zucosky is not credible. At the Unemployment Compensation Benefits Board hearing he testified that he told Mrs. Hyde in 1982 that she would not qualify for the position of claims supervisor because there were minimum requirements of a college degree and three to five years outside adjuster experience. Yet, at the trial, when asked if he knew of the company's requirements when he was training Mrs. Hyde for the position, he stated that he did not. Either he was untruthful at the unemployment compensation hearing or at trial. I find that the latter is more probable.

Around the time he was training Mrs. Hyde, there were internal managerial discussions at the Branch Office about staffing, including the need for an additional claims supervisor. Mr. Zucosky, through a friend at Allstate Insurance Company, contacted Bruce Kleeman about interviewing for the job. Mr. Kleeman applied and was interviewed several times and then started with Protective in May, 1983. Mr. Bernier testified that in the course of discussions about another claims supervisor, Mr. Zucosky called the personnel officer at the Home Office and was told the minimum requirements for this position. Mr. Kleeman, before submitting his application, learned of the hiring requirements from Mr. Zucosky. Therefore, it is probable that Mr. Zucosky did indeed tell Mrs. Hyde that she would not qualify for the position of claims supervisor because of education and experience factors.

Moreover, I find that he never undertook to train Mrs. Hyde to be a claims supervisor, but rather to handle small property damage claims. A claims supervisor would be responsible for handling the full range of claims, especially the significant and numerous personal injury claims, which were increasing. By her own admission, Mrs. Hyde was not trained to step immediately into the shoes of an experienced adjuster or claims supervisor in such matters. The company had an obvious need, with its growing claims files, for just such an experienced person. In all her years with the company, Mrs. Hyde had never had primary responsibility for the handling of any personal injury claim, however small, and, at most, had only handled property damage claims valued at $300 or less. Thus, it is not reasonable to expect that Mr. Zucosky or the company would have delegated any significant level of claims settlement authority to Mrs. Hyde. Mr. Zucosky testified that he never told Mr. Bernier or any one at the Home Office that he was training Mrs. Hyde, never determined if there was a position available, and, according to him, never checked to see if there were any minimum requirements for the job. In his testimony on direct examination, he stated

that the training of Mrs. Hyde would have led to a promotion. After further questioning, he modified his statement to the effect that plaintiff would have been recommended, presumably by him, for a raise based upon her assumption of more responsible duties, but would not have assumed the position of claims supervisor. Consequently, I conclude that Mr. Zucosky never specifically told Mrs. Hyde that she was in training for the job of claims supervisor.

Plaintiff contends that had she been given on-the-job training she would have been able to assume the full duties of a claims supervisor. I find that given the way in which the company operated, it did not have the ability to train claims supervisors. It used outside or independent adjusters to do the investigative field work, make reports and/or to recommend levels of settlement. For that reason, it was not unreasonable or discriminatory for the company to seek an experienced adjuster to fulfill the responsibilities of claims supervisor.

Plaintiff also urges that the college degree and three to five years of adjusting experience requirements for the job be found non-job related. Based upon the record evidence, I cannot find that plaintiff has carried her burden in this respect. Considering the job performance requirements of the position, I cannot say that the hiring requirements are arbitrary, unreasonable or a pretext for sex discrimination. For example, there was no evidence that females in the workforce today are disproportionately underrepresented in terms of college degrees or that industry-wide there are no female claims adjusters, although they may be few. That Protective has not received an application from any female claims adjuster for the position of claims supervisor has not been shown to be indicative of discriminatory non-hiring intent. The absence of qualified female applicants to Protective may be the result of scarcity of numbers of female adjusters in the workforce and does not necessarily imply that Protective preferred males for the position of claims supervisor. Protective does have female managers on the underwriting side of the business, which has not

been shown to be any less important than the claims side. The Secretary-Treasurer of the company is female and over 40.

Mrs. Hyde points to her inability to get a job in the insurance industry after she left Protective as evidence of her being blackballed. However, she had applied for positions as a claims adjuster, a position for which she was not qualified. Once she applied for secretarial positions, she was hired, albeit not by an insurance company. Consequently, I find that it was plaintiff's applying for positions for which she was not qualified, and not blackballing, that hindered her progress in obtaining subsequent employment.

In conclusion, plaintiff has failed to show that either sex and age discrimination played a "but for" role in Protective's employment decisions concerning her.

Accordingly, judgment shall be entered in favor of defendant and against plaintiff.